**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy Case No. |
| STEVEN WAYNE NORWOOD | ) | 12-23027 HRT |
| | ) | Chapter 13 |
| Debtor. | ) | Converted from Chapter 7 |
| | ) | |

**ORDER ON MOTIONS TO RECONSIDER CONVERSION TO CHAPTER 13**

THIS MATTER is before the Court on the Motion for Voluntary Conversion and Award of Legal Expenses filed by Debtor (docket #193, #194) ("Conversion Motion") and the Motions to Reconsider filed by the United States Trustee ("UST") (docket #214); Wendy Harvel on behalf of the Harvel Creditors[1] (docket #216); and the Chapter 7 Trustee (docket #230, #231). The Court held an evidentiary hearing on the motions on May 30, 2013,[2] has reviewed its docket and is ready to rule.

I.  Background.[3]

This is Debtor's fifth bankruptcy case filed in Colorado, and his third in less than two years. The Debtor filed the current case as a Chapter 7 case on June 21, 2012, on the eve of a state court proceeding where the Harvel Creditors sought to evict Debtor from his residence at 821 Hummer Drive in Nederland, Colorado (the "Hummer Property"). In the state court proceeding, the Harvel Creditors also claimed damages for the conversion of funds, and Debtor filed counterclaims under

---

[1]  The Harvel Creditors are: Harvel 821 Hummer, LLC, Sigtech, Inc., and Kermit and Carolyn Harvel. Kermit Harvel is Debtor's uncle.

[2]  Near the conclusion of the hearing, during closing argument, the Court was unable to hear Debtor on the phone line. The Court took a recess and had its technicians check the phone lines, which were reported operational. The Court was able to hear the other parties on the phone but was not able to hear Debtor. The Court attempted to contact Debtor but his phone was not accepting calls. The Court then advised it had heard sufficient evidence and argument to make its decision, and took the Conversion Motion and the Motions to Reconsider under advisement. The next day, the Debtor called the Court's chambers and requested to submit the remainder of his closing argument in writing. This request was granted by order of June 3, 2013. All parties have now submitted their closing arguments (docket #285, #288, #292, #294).

[3]  Portions of this section are duplicated in this Court's Order Denying Motion to Change Venue, entered on June 28, 2013 (docket #295).

theories of breach of contract and unjust enrichment.   On July 21, 2012, the Chapter 7 Trustee, Simon Rodriguez (the "Trustee") filed two motions to dismiss the bankruptcy case: one for failure to provide tax returns (docket #13) and one for Debtor's failure to attend his § 341 meeting of creditors (docket #14).  The UST filed a response to the Trustee's motions to dismiss (docket #16), agreeing that the Debtor's case should be dismissed but asking for additional relief, given the Debtor's history of filing deficient cases on the eve of foreclosure or eviction, and failing to prosecute the cases or pay the filing fee.

The Court held a hearing on the motions and responses on September 25, 2012.  At the outset, the Trustee asked the Court to hold the motions to dismiss in abeyance subject to the Debtor's attendance at a rescheduled § 341 meeting and cooperation with the administration of the bankruptcy estate. The UST and Harvel Creditors agreed with the request, but asked the Court to consider the merits of the UST's motion for additional relief, which requested relief from stay so that the Harvel Creditors could proceed with state court eviction proceedings against Debtor, as well as *in rem* relief under § 362(d)(4)(B).[4]   The UST asserted that while dismissal of the case may be justified, granting relief from stay would be an appropriate alternate remedy.  The Trustee advised that granting relief from stay to the Harvel Creditors, while continuing to allow the Trustee to investigate Debtor's assets in the bankruptcy, would provide relief to creditors, while dismissal might reward Debtor for his abuse of the bankruptcy process.  The Harvel Creditors also agreed that relief from stay would be an appropriate remedy, and, three days later, filed a motion for relief from stay that asked for the same relief outlined by the UST in its motion for additional relief (docket #59).

Being so advised, the Court determined that it would hold the motions to dismiss in abeyance.  And, in order to consider the UST's motion for additional relief, it would hear evidence on the UST's allegations that Debtor had abused the bankruptcy process in order to determine what remedy was appropriate in the case, whether it be dismissal of the case, the granting of relief from stay, or otherwise.   After taking evidence and testimony from all parties and hearing closing arguments, the Court took the UST's request for additional relief under advisement to consider the entire record in the case prior to making its decision.  The Court then addressed the need to reschedule the meeting of creditors.  The Trustee advised he could hold the meeting that day, or the following day, and had meeting rooms available.  Debtor told the Court he was not available, and that the next week would work better for him.  Debtor also advised that morning hearings were difficult and that he would prefer an afternoon meeting.  The Court asked Debtor if October 1, 2012, at 1:30 p.m. would fit the Debtor's schedule, and Debtor responded affirmatively.  The other parties also agreed to that date and time.  The Court advised that the Debtor was fully expected to appear at that meeting.

---

[4]  That section provides that the Court may grant relief from the automatic stay against real property if the Court finds that the filing of the debtor's bankruptcy petition was part of a scheme to delay, hinder, and defraud creditors that involved multiple bankruptcy filings affecting such real property.

Having taken the matters under advisement, the Court issued an order on October 10, 2012, which noted Debtor's failure to appear at the rescheduled § 341 meeting,[5] summarized Debtor's multiple bankruptcy filings, and found that Debtor had engaged in a scheme to delay, hinder, and defraud his creditors.  The Court thus granted relief from stay under § 362(d)(4)(B) to the UST and the Harvel Creditors to proceed with the state court eviction proceeding, and authorized the Trustee to pursue Debtor's counterclaims in that action on behalf of the Chapter 7 estate, as appropriate (docket #67).[6]  The Court also set a hearing for November 13, 2012,  to determine whether sanctions should be granted for Debtor's failure to appear at the rescheduled  § 341 meeting.

Meanwhile, the Trustee continued with the administration of the estate, and on October 16, 2012, filed an objection to Debtor's exemptions.  In that objection, the Trustee noted that Debtor was attempting to claim a homestead exemption in property the Debtor had listed on Schedule A as a "building lot" located at 13796 Enterprise Road in Gila Bend, Arizona (the "Arizona Property"), even though Debtor had previously represented that he resided at the Hummer Property.  The Trustee also objected to Debtor's potential, but as yet, unclaimed exemptions,[7] including an interest in the probate estate of Velma C. Harvel (Debtor's grandmother), and a claim against the Harvel Creditors for unpaid wages.  Debtor responded three days later by filing a motion to dismiss his case.[8]  On October 24, the Court granted the Trustee's application to employ a real estate agent to sell property in Hawaii that Debtor had listed on his Schedule A as a "building lot" worth $14,000 with "$1,000 owed to subdivision and $300"[sic] (the "Hawaii Property").  As of this time, Debtor had not claimed the Hawaii Property as exempt.  On the same date, the Trustee filed a notice indicating that a continued meeting of creditors had been set for November 7, 2012.

The rescheduled meeting of creditors was held on November 7, but Debtor failed to provide proper identification or proof of social security number.  The Trustee was unable to get adequate information from Debtor and concluded that Debtor was being evasive.  The parties agreed to reschedule the meeting for November 28.  On November 9, Debtor filed a response to the Trustee's objections to his exemptions, stating that he claimed exemptions "in the Arizona property, his paid and unpaid wages, the Texas probate, personal property located in Hawaii, and ANY other exemptions allowed by law."   Debtor also filed a request to appear by phone at the November 13,

---

[5]   The day after the Debtor failed to appear at the October 1, 2012, rescheduled § 341 meeting, the Trustee filed a motion for the entry of an order to show cause why the Debtor should not be sanctioned for failure to appear (docket #66).

[6]   Debtor did not appeal the order at docket #67.

[7]   The Trustee asserted that an investigation of the estate had led the Trustee to conclude that Debtor might claim these exemptions.

[8]   Debtor also filed an amended motion to dismiss on October 30, 2012.  The UST, Trustee, and the Harvel Creditors opposed the motion, arguing that, having failed in his efforts to further delay eviction,  Debtor was now attempting to avoid further scrutiny of his financial affairs and demonstrating a lack of candor by seeking voluntary dismissal of his case.  Debtor's motion was denied in this Court's order dated November 13, 2012 (docket #107), in connection with the show cause hearing.

3

2012, show cause hearing (docket #102). The Court did not excuse Debtor's personal attendance at this hearing (docket #106, 107), but did allow Debtor to participate in the hearing by phone. [9]

At the November 13, 2012, order to show cause hearing, the Court ordered that sanctions against Debtor be held in abeyance pending Debtor's cooperation with the Trustee's requests, including: 1) Debtor's attendance at a continued § 341 meeting before December 7, 2012, with proof of identification and social security number; 2) The turnover[10] of $12,000 in "cash on hand" that Debtor had listed on his Trustee Information sheet;[11] and 3) The filing of a change of address form containing a physical address in Arizona, since Debtor had given conflicting information[12] on where the building lot was located (docket #107). Debtor appealed this order, but no stay of appeal was granted.[13]   On November 15, 2012, Trustee noticed the continued meeting of creditors for November 28, 2012. Debtor failed to attend, however, and the Trustee filed a second motion for sanctions.

On December 10, 2012, Debtor filed a change of address form indicating that his current mailing address was a P.O. Box in Buckeye, Arizona. On December 13, 2012, Debtor amended his statements and schedules. His original schedules had reflected that he had "no income, just school loans and food stamps and CICP medical coverage."[14] In his amended statement of financial affairs (docket #125), he listed $28,000 as "income" and "rehab expenses," earned from May 2011 to December 2011, and that he had paid himself in 2012 out of a joint account with the Harvel Creditors. In his amended schedules (docket #126), he changed the description of his Hawaii Property in Schedule A to a "burial plot" worth "16,000 less liens and taxes =$7,900."[15] For the first time, he listed an interest in the Velma Harvel probate estate and valued it at "$0/unknown."

---

[9] The Court then allowed Debtor to appear by phone at subsequent hearings, to prevent further delays in getting to the merits of the several pending matters before the Court.

[10] The Court ordered these funds to be turned over to the Trustee for safekeeping until a determination could be made as to ownership of the funds. In hearings held subsequent to the issuance of the order, Debtor has advised the Court that the money has been spent.

[11] Docket #105, Exhibit 1.

[12] In the Trustee's objection to exemptions filed on October 16, the Trustee noted that at various times the property had been listed by the Debtor as: 37602 South Enterprise Road, Arlington, Arizona 85322; 13760 Enterprise Road, Gila Bend, Arizona 85337; and 13796 Enterprise Road, Gila Bend, Arizona 85337.

[13] The appeal (BAP #12-101) was dismissed for failure to prosecute on June 26, 2013. On July 1, 2013, the Bankruptcy Appellate Panel entered an order advising Debtor that if he cured all outstanding deficiencies related to his brief and appendix, the appeal would be reopened. The appeal was reopened on July 19, 2013.

[14] Schedule I, filed July 5, 2013 (docket #11).

[15] This is the same property for which the Trustee had already employed a real estate broker, in October, to explore potential sale options.

He claimed the Arizona Property and the Hawaii Property as exempt on Schedule C. He also claimed exemptions in the "wages" he had earned from the Harvel Creditors in 2011 and 2012. Finally, on Schedules D and G, he indicated the Hawaii Property was subject to a $6,500 lease.

On December 14, 2012, the UST filed an adversary proceeding, which the Trustee later joined, to deny Debtor's discharge under § 727. A trial in the adversary proceeding is currently set for October 9, 2013. The Harvel Creditors also filed an adversary proceeding against Debtor under §§ 523(a)(2)(A), 523(a)(4), and 727. The complaints allege that Debtor failed to disclose assets, listed false property addresses, failed to list creditors, made up facts and legal theories in response to the Trustee's attempts to administer the assets of the bankruptcy estate, and otherwise disregarded the requirements of the Bankruptcy Code.

On January 18, 2013, the Trustee timely[16] objected to the exemptions claimed in Debtor's amended schedules (docket #149). Debtor responded with a certificate of contested matter and request to schedule an afternoon hearing (docket #153). The Trustee also filed a certificate of contested matter in February. On March 1, 2013, the Court set a hearing for the afternoon of April 8, 2013 to consider the objections and Debtor's response.

On March 6, 2013, the Trustee moved to sell the Hawaii Property (the "Sale Motion"), having located a buyer for that property. Debtor responded and included a motion to seal medical records submitted with his response ("Motion to Seal"). The Court held a status conference on March 21, 2013, allowing the Debtor to appear by phone (docket #172). At that status conference, the Court determined that the April 8, 2013, hearing would be held on the Motion to Seal, and set a hearing for April 10, 2013, on the Sale Motion. Debtor advised the Court that these dates and times were available for him to participate by phone.[17] On the morning of April 8, 2013, however, Debtor filed the Conversion Motion and a Motion to Change Venue (the "Venue Motion").[18]

---

[16] Under Fed. R. Bankr. P. 4003(b)(1), the Trustee "may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors . . . is concluded." As no meeting of creditors was ever concluded, the Trustee's objection was timely.

[17] Debtor has advised the Court that due to medical issues, afternoon hearings are easier for him to attend (telephonically), than are morning hearings. The Court has accommodated Debtor in this regard by scheduling afternoon hearings throughout this proceeding, which has required setting two afternoon dates rather than one full hearing date, in order to provide sufficient time to adequately address the multiple pending matters.

[18] The Venue Motion was denied on June 28, 2013. On July 12, 2013, Debtor filed a motion to stay and a motion for reconsideration, as well as a notice of appeal and motion to waive filing fees. The Bankruptcy Appellate Panel docketed the appeal (BAP #13-052) as a premature appeal under Fed. R. Bankr. P. 8002(b)(4), pending this Court's determination of the motion to stay and motion for reconsideration. Those motions are currently under advisement.

Due to Debtor's filings, the Court was unable to proceed with the matters originally scheduled for the April 8 or April 10 hearings.[19]  Instead, at the April 8 hearing, which Debtor was allowed to attend by telephone, the Court granted Debtor's Conversion Motion under operation of Colorado Local Bankruptcy Rule 1017-1, which provides in pertinent part as follows:

(a) Conversion From Chapter 7 to Chapter 11, 12 or 13:

(1) No Prior Conversion: To convert a case from chapter 7 to chapter 11, 12 or 13 pursuant to 11 U.S.C. § 706(a), where eligible, the debtor must file a Motion for Voluntary Conversion in accordance with Fed. R. Bankr. P. 1017(f)(2), whereupon the Clerk will, if the case has not been previously converted under 11 U.S.C. §§ 1112, 1208 or 1307, enter a virtual text order effecting the conversion.

(2)  Prior Conversion: In the event that the case has been previously converted, the debtor must comply with 11 U.S.C. § 706(c) and file a motion for conversion with notice to creditors pursuant to L.B.R. 9013–1.
....

(d) Reconsideration: Any party in interest may file a motion to reconsider the conversion of the case within the time specified by Fed. R. Bankr. P. 9023 and 9024.

The Court advised the parties that its order granting conversion of Debtor's Chapter 7 case to Chapter 13 (the "Conversion Order") was subject to reconsideration under *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007) ("*Marrama*"*)*, and gave parties until April 25, 2013, to file motions to reconsider the Conversion Order and to file objections to Debtor's Venue Motion and Motion to Seal.  The Court scheduled hearings on those matters for 1:30 p.m. on May 13, 2013, and reserved the afternoon of May 22, 2013 for a second day of hearings, if required.  Debtor advised the Court that he was available for a telephonic hearing on both of those dates and times.  Timely motions and responses were then filed.

Just prior to the May 13, 2013, hearing,[20] Debtor called the Court and stated he was not prepared to go forward, and advised that he had mailed a motion to continue.  At the hearing, however, Debtor called the Court at the appointed time and stated he was ready to argue the Venue Motion, but not any of the other motions scheduled for hearing that day.  Accordingly, the Court took evidence and  heard arguments on the Venue Motion and reset the remaining motions,

---

[19]  The April 10 hearing was vacated.

[20]  May 13 was a Monday.  On Friday evening, May 10, Debtor left a voice mail message with this Court's Courtroom Deputy stating he believed the Chapter 13 Trustee would file a motion for continuance of the Monday hearing.  He also spoke to a team member in another Judge's chambers, stated he would not be able to make it to the Monday hearing, and was advised to check with this Judge's chambers on Monday morning.  On Monday morning, this Court's Courtroom Deputy called and left two messages for Debtor that he may call in at the appointed time, and any request to continue would be considered.  The Debtor confirmed receipt of the phone messages at 12:45 p.m.  The Chapter 13 Trustee never filed a motion to continue the hearing.

including the Motion to Seal and the Conversion Motion, for hearing on May 30, 2013 (at the request of Debtor, who stated he was now unavailable on May 22, the date originally scheduled for the second day of hearings, if needed). The Court thus determined that Debtor's motion to continue was moot. On May 30, 2013, the Court heard evidence and testimony on the Conversion Motion and the Motions to Reconsider, and took the matters under advisement. The Court granted in part and denied in part the Motion to Seal from the bench.[21]


## II. Standards for the Motions to Reconsider.

"Bankruptcy Rules 9023 and 9024 make Federal Rules of Civil Procedure 59 and 60 applicable to bankruptcy cases. Bankruptcy Rule 9023 requires a motion to alter or amend a judgment to be filed within 14 days after entry of a judgment, rather than within 28 days, as provided in Civil Rule 59. With a few specific exceptions, Bankruptcy Rule 9024 incorporates the time limitations set forth in Civil Rule 60." *In re Nordin*, 2013 WL 936370, at *3 (10th Cir. BAP 2013). Although "motions to reconsider" are not formally recognized by the Federal Rules of Civil Procedure, "regardless of how it is styled or construed ... a motion filed within [14] days of the entry of judgment that questions the correctness of the judgment is properly treated as a Rule 59(e)[22] motion." *Id.* (citing *Vreeken v. Davis*, 718 F.2d 343, 345 (10th Cir. 1983)).

Here, the Conversion Order entered on April 8, 2013, and the Court ordered parties to file motions to reconsider by April 25, 2013. The UST and Harvel Creditors filed their Motions to Reconsider on April 18, 2013, and the Trustee filed his Motion to Reconsider on April 25, 2013. The UST argued that Debtor was ineligible to be a debtor under § 109(e) due to a lack of regular income, and because he had moved for conversion in bad faith. The UST noted that the Harvel Creditors and the Trustee were contemplating filing motions that would elaborate on Debtor's bad faith. The Harvel Creditors agreed with and supported the UST's Motion to Reconsider, and added additional examples of Debtor's bad faith conduct as grounds to reconsider the Conversion Order. In the Trustee's Motion to Reconsider, he stated that he incorporated the entirety of the Motions to Reconsider filed by the UST and Harvel Creditors. The Trustee then argued primarily that Debtor's Chapter 13 Plan was not proposed in good faith under § 1325(a)(3). None of the motions stated whether they were moving to reconsider under Bankruptcy Rule 9023 or 9024, or Fed. R. Civ. P. 59 or 60. The Tenth Circuit generally has espoused the rule stated in *Nordin*, above, that a motion filed within 14 days of the entry of judgment that questions the correctness of the judgment is properly treated as a Rule 59(e) motion, and a motion filed outside that period is treated as one

---

[21]   (Docket #267, 268). By procedural order, access to Debtor's sealed records was to be granted to the UST, Chapter 7 Trustee, and Chapter 13 Trustee, effective June 14, 2013. However, Debtor filed a motion to stay and to reconsider these orders on the evening of June 13, 2013. Out of an abundance of caution, after the Court received Debtor's motion, the Court again restricted access to the records until the motion to stay and motion for reconsideration could be determined. By order entered July 8, 2013, the Court denied the motion to stay and for reconsideration (docket #299).

[22]   That rule provides: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Bankr. P. 9023 changes the time period to 14 days.

under Fed. R. Civ. P. 60(b). *See Manco v. Werholtz*, 528 F.3d 760, 761(10th Cir. 2008) (citing *Hatfield v. Bd. of County Commr's*, 52 F. 3d 858, 861 (10th Cir. 1995)).

Because the UST and Harvel Creditors filed their motions within 14 days of the Conversion Order, the Court must consider those motions under Bankruptcy Rule 9023 and Fed. R. Civ. P. 59. The Trustee adopted the arguments of the UST and Harvel Creditors when it filed its motion (in accordance with the Court's order), 17 days after the Conversion Order entered.[23] This Court concludes, however, that whether it evaluates the motions under Rule 59 or Rule 60, the result is the same: the Motions to Reconsider should be granted to prevent injustice.

In *In re McDonald*, 2013 WL 1969266, at *7 (Bankr. D. Colo. 2013), a division of this Court recently stated that examining whether a debtor converted his case in bad faith "falls within the framework of whether there is a need to correct clear error or prevent manifest injustice." That court evaluated a motion to reconsider a conversion order under Bankruptcy Rule 9023 and Fed. R. Civ. P. 59. Under Rule 59, there are three major grounds that justify reconsideration: (1) an intervening change in the controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice. *In re Zamora*, 251 B.R. 591, 595 (D. Colo. 2000).

Likewise, Rule 60(b)(6)[24] has been applied to prevent injustice. The leading case is *Klapprott v United States*, 335 US 601, 614 (1949), in which Mr. Justice Black stated: "In simple English, the language of the 'other reason' clause, for all reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." The federal courts have generally applied clause (6) liberally whenever modification or vacation of a judgment appeared appropriate to accomplish justice. *See Phelps v. Alameida*, 569 F.3d 1120,1135 (9th Cir. 2009)(Catch-all provision of rule providing grounds for relief from a final judgment, order, or proceeding is "a grand reservoir of equitable power, and it affords courts the discretion and power to vacate judgments whenever such action is appropriate to accomplish justice."); *Fleming v. Gulf Oil Corp*., 547 F.2d 908, 912 (10th Cir. 1977) ("Like Rule 60(b) generally, clause (6) should be liberally applied to situations not covered by the preceding five clauses so that, giving due regard to the sound interest underlying the finality of judgments, the district court, nevertheless, has power to grant relief from a judgment whenever, under all the surrounding circumstances, such action is appropriate in the furtherance of justice.").

Finally, in *Nordin*, the Tenth Circuit Bankruptcy Appellate Panel recognized that to deny a party the "right to litigate their objection to [Debtor's] efforts to convert to Chapter 13 would be manifestly unjust." That Court also found that Colorado Local Bankruptcy Rule 1017–1 "was

---

[23] The Court gave the parties extra time to file motions to reconsider because of the last-minute filing of Debtor's Conversion Motion and Venue Motion.

[24] Rule 60(b) provides: "the court may relieve a party . . . from a final judgment, order or proceeding for the following reasons [listing five enumerated reasons] or . . . (6) any other reason that justifies relief." The parties did not argue and the Court cannot find that any of the first five enumerated reasons apply.

designed to simplify the process for good faith debtors to convert to Chapter 13 while reserving parties' rights to object to bad faith conversions; it does not eliminate substantive consideration of the merits of the conversion."

## III.  Conversion to Chapter 13 and Standards for Reconverting to Chapter 7.

In their Motions to Reconsider, the UST, the Trustee, and Harvel Creditors have alleged that under *Marrama*,  Debtor is ineligible to be a debtor in Chapter 13 because he is not an individual with a regular income under 11 U.S.C. § 109(e), and because he sought to convert to Chapter 13 in bad faith.  The Trustee further argues that Debtor's proposed Chapter 13 Plan was not filed in good faith.

In *Marrama*,  a Chapter 7 debtor's schedules contained misleading or inaccurate statements. Marrama asserted a homestead exemption in rental property, and did not disclose an anticipated tax refund.  *Marrama* at 369 n. 3.  Marrama also omitted his ownership interest in his principal asset, a house in Maine, and failed to disclose his transfer of the property to a newly-created trust for no consideration.  *Id.* at 368-369.  After the Chapter 7 trustee announced his intention to recover the Maine property, Marrama filed a motion to convert his case to Chapter 13.  *Id.*  The bankruptcy court denied the debtor's request to convert to Chapter 13, and the Bankruptcy Appellate Panel for the First Circuit, the First Circuit Court of Appeals and the United States Supreme Court affirmed.

The Supreme Court held the "absolute right" to convert a case from Chapter 7 to Chapter 13 under § 706(a)[25] is possessed only by "[t]he class of honest but unfortunate debtors" who seek "the chance to repay their debts should they acquire the means to do so."  *Id.* at 374.  The class of eligible Chapter 13 debtors does not include an "atypical" debtor whose bad faith demonstrates he is not entitled to relief afforded to a good faith debtor.  *Id.*  The Supreme Court concluded a debtor's right to convert a case under § 706(a), when coupled with bad faith conduct, is not absolute.  *Id.*

Thus, after *Marrama*, the "absolute right" to convert under § 706(a) is limited by § 706(d), with the focus on whether "the debtor may be a debtor under such chapter."[26]  Section 706(d) implicates § 109(e), which provides, in relevant part:

> Only an individual with *regular income* that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $383,175 and noncontingent, liquidated, secured debts of less than $1,149,525 . . . may be a debtor under chapter 13 of this title.  (Emphasis added).

---

[25]  That section provides: "The debtor may convert a case under this chapter to a case under chapter 11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307 of this title. Any waiver of the right to convert a case under this subsection is unenforceable."

[26]  § 706(d) provides: "Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter."

In addition to the income requirement, the Supreme Court held that the class of eligible Chapter 13 debtors does not include an "atypical" debtor whose bad faith demonstrates that he is not entitled to relief afforded to a good faith debtor. *Id.* at 374-75.  Thus, a debtor who acts in bad faith may not "be a debtor" under 706(d).  *See In re Nordin*, 2013 WL 936370, at *5 (10th Cir. BAP 2013). The Supreme Court also recognized in *Marrama* that the analysis under § 706(d) is the same bad faith analysis for finding cause for dismissal or conversion under § 1307(c).  It follows that the same conduct considered and found sufficient to deny conversion of a Chapter 7 case to a Chapter 13 case, would be sufficient to convert a Chapter 13 case back to Chapter 7.  As a result, after *Marrama*, eligibility for conversion from Chapter 7 to Chapter 13 under § 706(a) "is dependent on two things: first, whether the debtor is eligible to be a debtor under chapter 13 under 11 U.S.C. § 109(e); and second, whether the case, if converted, would be dismissed under 11 U.S.C. § 1307(c)."  *In re McDonald*, 2013 WL 1969266, at *4 (Bankr. D. Colo. 2013). Additionally, the issue of bad faith is a question of fact determined by the totality of the circumstances, and this includes both pre-petition conduct and postpetition conduct during the Chapter 7 case.  *Id.* at *7.

A debtor seeking to convert a case from Chapter 7 has an initial burden to show that the debtor has not previously converted the case to Chapter 7, and that the debtor is otherwise eligible to be a debtor[27] under the new chapter.  Once the debtor establishes these requirements, the burden is placed on an objecting party to show that the debtor is attempting to convert the case in bad faith. *Id.* (citing *In re George Love Farming, LC*, 366 B.R. 170, 179 (Bankr. D. Utah 2007).  Moreover, "the obligation of good faith is imposed on the debtor at two stages of a Chapter 13 proceeding. First, a debtor must file the Chapter 13 petition in good faith.  Second, the debtor must file the Chapter 13 plan in good faith."  *In re Sullivan,*, 326 B.R. 204, 211 (1st Cir. BAP 2005); *see also In re Gier*, 986 F.2d 1326, 1329 (10th Cir. 1993) (noting that good faith inquiry under § 1307(c), regarding the filing of the petition, and § 1325(a)(3), regarding the filing of the plan, both require an evaluation of  whether there has been an abuse of the "provisions, purpose, or spirit" of Chapter 13).

Thus, this Court must analyze (1) whether Debtor "may be a debtor" under § 706(d), in terms of the income requirements of § 109(e); (2) whether Debtor "may be a debtor" under Chapter 13 or if he is the "atypical debtor" who is not eligible to be a Chapter 13 debtor pursuant to 706(d) because of his bad faith; (3) whether Debtor filed his Chapter 13 petition (or as in this case, the Conversion Motion) in good faith; and (4) whether Debtor filed his Chapter 13 Plan in good faith.

---

[27]  The issue of whether the debtor is "otherwise eligible to be a debtor" refers both to the income requirements of § 109 and the good faith requirement articulated in *Marrama*.  In other words, the debtor has the initial burden to show good faith.  *See In re Alexander*, 363 B.R. 917, 922 (10th Cir. BAP 2007) ("the party who seeks discharge under Chapter 13 bears the burden of proving good faith.  Best efforts under § 1325(b), without more, are not enough."

A.  Is Debtor Eligible to be a Chapter 13 Debtor under § 109(e)?

Regarding the first prong, the UST[28] argues that Debtor cannot demonstrate that as of the entry of the Conversion Order on April 8, 2013, he had regular income as required for a Chapter 13 debtor, citing *In re Hickman*, 104 B.R. 374, 376 (Bankr. D. Colo. 1989) (regular income "must be income, or more accurately an income stream, that is to a substantial degree reliable and certain in amount and sufficient to fund payments for the term of a plan.  It should be reasonably predicable and dependable.")  In determining whether a debtor has "regular income" required for Chapter 13 eligibility, a court must conclude that a debtor is able to make required payments under a Chapter 13 plan; thus, there must be some factual basis for the court to determine the regularity and stability of debtor's income.  *In re Letterese*, 397 B.R. 507, 514 (Bankr. S.D. Fla. 2008).  It is incumbent upon a debtor to sufficiently demonstrate an ability to fund Chapter 13 plan payments from sources which are stable and regular. *In re Bartelini*, 434 B.R. 285, 292 (Bankr. N.D. N.Y. 2010).  Additionally, a debtor cannot satisfy the income requirement for Chapter 13 eligibility by mere allegations that there is an income potential which is contingent upon developments that appear unlikely.  *In re Pellegrino*, 423 B.R. 586, 590 (1st Cir. BAP 2010).

In Debtor's most recent Schedule I, filed on May 29, 2013 (docket #264), he listed his average monthly income as $1,740, from the following sources: "social security disability, food stamps, inheritance, family, school, and employment."  At the May 30, 2013, hearing, however, when the UST asked Debtor if he was employed, the Debtor refused to answer certain questions about the employment and instead pled the Fifth Amendment protection against self-incrimination.  Debtor was then asked what his sources of income were.  Debtor responded that he received $200 monthly in food stamps, and $8,000 from student loans per semester.  When asked what financial assistance he received from his family, he again refused to answer and pled the Fifth Amendment.  When questioned by the UST as to whether he receives a paycheck, Debtor again pled the Fifth Amendment.  When pressed, Debtor stated that his student loans were his most stable source of income.

Student loans are not considered a feasible income stream to fund a Chapter 13 Plan.  *See In re Kelly,* 217 B.R. 273, 275 (Bankr. D. Neb. 1997) ("The debtor proposes to fund his plan primarily with student loans. . . .[I]t is simply not equitable for the debtor to voluntarily remain under-employed, to obtain the benefit of an advanced college degree, and to discharge his obligations to creditors upon payment of a nominal dividend.").  Further, student loans are nondischargeable debts.  In Debtor's initial schedules filed on July 5, 2013 (docket #11), he listed $110,000 in student loans, but indicated they were in deferment.  Even if the loans are in deferment, they will eventually need to be repaid.  Additionally, at the May 30 hearing, Debtor testified that he was considering entrance into another degree program, which would require more student loans, and that those loans would help him fund his Chapter 13 Plan.  Not only is such future "income" speculative, *see Hamilton v. Lanning*, 130 S.Ct. 2464 (2010), it would be against public policy to allow Debtor to incur further student loan debt to fund a Chapter 13 Plan.  *See  Milavetz Gallop & Milavetz, P.A. v. U.S.*, 559 U.S. 229, 243 (2010) (It is abusive for a debtor to incur debt with no present ability to repay in contemplation of bankruptcy).

---

[28]  The Trustee and Harvel Creditors adopted the UST's arguments on this issue.

Social Security benefits can be a source of regular income, *In re Rigales*, 290 B.R. 401 (Bankr. D. N.M. 2003), but Debtor provided no evidence that he has been approved for such benefits, or that he will have enough in benefits to fund a Chapter 13 plan.[29]  Food stamps have been considered a regular source of income, but usually the amounts are so minimal that they are not adequate to fund a confirmable Chapter 13 Plan.  *See In re Shebel*, 22 B.R. 9 (Bankr. D. Vt. 1982).  Depending on its regularity, an inheritance or family assistance possibly could be a regular source of income.  *See Pellegrino*, 423 B.R. at 590.  But in this case, at the May 30 hearing,  Mr. Kermit Harvel, the Debtor's uncle, testified that he is the administrator of the Velma Harvel probate estate, of which the Debtor is a beneficiary, and that the last inheritance distribution made to Debtor occurred in 2009 in the approximate amount of between $1,500 and $2,000.  He also testified that he has not made any inheritance distributions since, because of current and potential pending litigation costs,[30] and is not providing Debtor with any other financial assistance.  As a further indication of the speculative nature of this income stream, even the Debtor listed the probate estate as having a value of "$0/unknown" on his amended schedules dated December 13, 2012.

Additionally, regarding employment income, Debtor's representations and testimony, up until he sought conversion to Chapter 13, were that he was unable to secure regular employment. For instance, in his application for waiver of the Chapter 7 filing fee filed June 21, 2012 (docket #3), he stated that his total monthly income was $200 from food stamps, and his total monthly expenses were $1,150. He also included a statement that "I am uncertain of my ability to work.  I am still working on my masters thesis for San Diego State University, so will not have work income during this period."  Further, Debtor testified during the May 30 hearing that he may continue his education and take out more student loans to do so, which leads the Court to conclude that Debtor's uncertainty regarding his ability to work may continue.

Finally, the Court cannot evaluate whether Debtor has since secured regular employment. Debtor indicated, on his most recent Schedule I, that the name of his employer was "sealed,"[31] and then refused to answer questions about the employment at the May 30 hearing, instead choosing to plead the Fifth Amendment.  Specifically, Debtor refused to answer the most basic questions about his alleged employment by an employer in El Paso, Texas,  including who the employer was, what kind of work he did for the employer, how he was paid, how much he was paid, or any other information about the employer.   The following is an excerpt from the Debtor's testimony in this regard:

---

[29]  On May 29, 2013,  Debtor filed, as a sealed document, which has been unsealed by subsequent Court order, a one-page document reflecting that Debtor "had completed the initial portion" of a disability appeal with the social security administration on May 23, 2013.  No other information as to benefits was provided.  (Docket #258).

[30]  There is a dispute in Texas probate court between Debtor and the Harvel Creditors regarding the Velma C. Harvel Estate.

[31]  The Court is unaware of any motion by the Debtor requesting that information concerning his employment on file with the Court be sealed.  Apparently, the information simply was not provided and claimed by the Debtor to be sealed.

UST: "Do you get income that is subject to tax withholding from [the Texas] employer?"
Debtor: " I'm going to have to plead the Fifth Amendment."
UST: "Do you get a paycheck from that employer?"
Debtor: "I requested that would be under seal."
Court: "The question is whether you get a paycheck."
Debtor: "I am going to plead the Fifth Amendment."
UST: "What kind of work do you do for this employer?"
Debtor: "Again I don't wish to incriminate myself so I am going to plead the Fifth Amendment. The bankruptcy is interfering with my ability to do this work."
UST: "Does this employer engage in legal activities?"
Debtor: "Yes."
UST: "Does the work you do for that employer involve any illegal conduct?"
Debtor: "No."
UST: "Why would answering the name of that employer tend to incriminate you?"
Debtor: "Because the trustee might contact that employer and I may end up losing my employment."
UST: "How long have you worked for this employer?"
Debtor: "Since April 2013."
UST: "Are you paid on an hourly basis?"
Debtor: "I will tell you that I get most of my income from school. Hopefully that will clear things up."
UST: "Do you get an electronic deposit?"
Debtor: "No."
UST: "Do you get cash?"
Debtor: "Again I am going to plead the Fifth Amendment."
UST: "What was your last payment from this employer in dollars and cents?"
Debtor: "I am going to plead the Fifth Amendment."

     The Court may draw a negative inference from the Debtor's invocation of the Fifth Amendment. *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976); *In re Marrama*, 445 F.3d 518, 522 (1st Cir. 2006); *In re Carp*, 340 F.3d 15, 23 (1st Cir. 2003). A negative inference is appropriate here. The Debtor has not used his Fifth Amendment privilege to shield himself from some potential criminal liability, but rather to keep information regarding his employment from the UST, Trustee, and Chapter 13 trustee. Such action is antithetical to the disclosure policies of the Bankruptcy Code and is further demonstration of the Debtor's continued lack of candor and cooperation in his case.

     In light of the foregoing, the Court has little, if any, evidence or factual basis to find that Debtor has the ability to make plan payments from any source of income that produces a reliable and sufficient payment stream to fund a plan. The Court finds that Debtor has not shown that he is eligible to be a debtor under Chapter 13, because he does not have regular income as required under § 109(e).

     B. Is Debtor an "atypical Debtor" who does not qualify as a person who "may be a [Chapter 13] debtor" pursuant to § 706(d) due to his bad faith conduct?

     The second prong of the two factors set forth in the *Marrama* analysis focuses on whether a debtor is an "atypical debtor" because the case, if converted, would be dismissed "for cause" under the non-exhaustive list of factors in § 1307(c). *Marrama* at 372. The Supreme Court noted that

"[n]one of the specified causes mentions prepetition bad-faith conduct . . . . Bankruptcy courts nevertheless routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words "for cause."[32]   The Supreme Court further stated, "We have no occasion here to articulate with precision what conduct qualifies as 'bad faith' sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case or to deny conversion from Chapter 7 [under 11 U.S.C. § 1307(c)]. It suffices to emphasize that the debtor's conduct must, in fact, be atypical.  Limiting dismissal or denial of conversion to extraordinary cases is particularly appropriate in light of the fact that lack of good faith in proposing a Chapter 13 plan is an express statutory ground for denying plan confirmation.  11 U.S.C.§ 1325(a)(3)." *Id.* at 375 n. 11.

The Tenth Circuit has evaluated the determination of good faith at two different stages of a Chapter 13 proceeding: the filing of a Chapter 13 petition and the filing of a proposed Chapter 13 plan.  In *In re Gier*, 986 F.2d 1326 (10th Cir. 1993), the Tenth Circuit adopted the reasoning of the Seventh Circuit in *In re Love*, 957 F.2d 1350 (7th Cir.1992), as follows:

> In *Love*, the Seventh Circuit addressed the difference between denying confirmation of a Chapter 13 plan under § 1325(a)(3) and dismissing a Chapter 13 petition under 11 U.S.C. § 1307(c). The court first noted that § 1307(c) permits a bankruptcy court to dismiss a Chapter 13 petition "for cause" and that "lack of good faith is sufficient cause for dismissal under Chapter 13." *Love*, 957 F.2d at 1354. The court reasoned, however, that because dismissal of a petition and denial of confirmation are governed by different provisions and may occur at different stages of a Chapter 13 case, "a bankruptcy court's rejection of a plan for lack of good faith does not necessarily lead to dismissal." *Id.*  It provided the following nonexhaustive list of factors relevant to a § 1307(c) bad faith inquiry:
>
>> the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the

---

[32]   The Court notes that in addition to Debtor's bad-faith conduct, this Court could dismiss or convert the Debtor's Chapter 13 case under the specific provisions of 11 U.S.C. § 1307(c)(1): "unreasonable delay by the debtor that is prejudicial to creditors."   The Court already has found that Debtor has engaged in a scheme to delay,  hinder, and defraud creditors, in his Chapter 7 case, in the Court's October 10, 2012, order that granted relief from stay under § 362(d)(4)(B) (docket #67).  Debtor has not performed his basic Chapter 7 duties, such as completing a § 341 meeting, cooperating with the Trustee, and providing basic information about his assets, liabilities, and other financial affairs.  Such nonperformance has led to numerous delays in the case that is prejudicial to creditors.  Further, the Court could dismiss or convert the case under § 1307(c)(5) for "denial of confirmation of a plan under section 1325 . . . and denial of a request made for additional time for filing another plan or a modification of a plan."  The Court could not confirm a Chapter 13 plan due to Debtor's failure to provide basic information about his income and his attempt to use impermissible sources to fund his Plan.  Given Debtor's conduct in this case, and especially his choice to plead the Fifth Amendment on such basic information, the Court would not grant permission to file another plan.

petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.  *Id.* at 1357.

We join the Seventh Circuit and conclude that in determining whether a Chapter 13 petition has been filed in bad faith under § 1307(c), the bankruptcy court must consider the "totality of the circumstances."  This approach is as appropriate for a § 1307(c) inquiry as it is for a § 1325(a)(3) inquiry because in each case it best assists the bankruptcy court's determination "whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [Chapter 13]. " *Id.* at 1357 (quoting *In re Smith*, 848 F.2d  813, 818 (7th Cir.1988)) (§ 1307(c) inquiry); cf. *Flygare*, 709 F.2d at 1347 (" '[A] finding of good faith requires an inquiry, on a case-by-case basis, into whether the plan abuses the provisions, purpose or spirit of Chapter 13.' " (quoting *Estus*, 695 F.2d at 315-16)) (§ 1325(a)(3) inquiry). Although we agree that the rejection of a Chapter 13 plan should not necessarily lead to dismissal, it is a factor for the bankruptcy court to consider as it determines whether to dismiss the petition pursuant to § 1307(c).

*In re Gier*, 986 F.2d 1326, 1329.  *See also In re Galanis*, 334 B.R. 685, 692 (Bankr. D. Utah 2005) ("Under the umbrella of the totality of the circumstances test, the [Circuit] developed two different sets of factors to consider in determining whether good faith exists under § 1325(a) ("Flygare factors") or under § 1307(c) ("Gier factors"). *See Flygare*, 709 F.2d at 1347 (listing 11 relevant factors); *Gier*, 986 F.2d at 1329 (listing 7 relevant factors)").  After *Gier* was decided, the Bankruptcy Code was amended to include § 1325(a)(7), which provides that a court shall confirm a *plan* if the *petition* was filed in good faith, thus explicitly recognizing that good faith is required at both the petition and plan stages of a Chapter 13 proceeding.   Although *Gier* was decided in 1993, the Tenth Circuit Bankruptcy Appellate Panel in 2007 recognized that the *Gier* case was "to date the Tenth Circuit's most comprehensive discussion of bad faith vis a vis § 1307."  *In re Alexander*, 363 B.R. 917, 925 (10th Cir. BAP 2007).

To determine whether a *plan* has been filed in good faith under § 1325(a)(3), the Tenth Circuit has applied the non-exhaustive *Flygare* factors, which are as follows:

(1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee.

15

*In re Cranmer*, 697 F.3d 1314, 1318-19 (10th Cir. 2012) (citing *Flygare v. Boulden*, 709 F.2d 1344, 1347–48 (10th Cir.1983).

The Tenth Circuit in *Cranmer* noted that, after *Flygare* was decided, the Bankruptcy Code was amended to include 11 U.S.C. § 1325(b), which criteria subsumes most of the factors, and, therefore, the good faith inquiry now "has a more narrow focus." *Id.*   A bankruptcy court must consider "factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code." *Id.; see also Robinson v. Tenantry (In re Robinson),* 987 F.2d 665, 668 n. 7 (10th Cir.1993).  For ease of reference, this Court will refer to these three requirements as the "*Cranmer* factors."

There is some overlap among the *Gier*,  *Flygare*, and *Cranmer* factors.[33]  For instance, the first *Gier* factor, "the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding" is the same as the seventh *Flygare* factor (the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7).  Also, other courts have used a combination of the *Gier, Flygare, and Cranmer* factors.  *See, e.g., In re Sullivan*, 326 B.R. 204,  212 (1st Cir. BAP 2005) (to determine whether a Chapter 13 petition has been filed in bad faith under § 1307(c), bankruptcy courts generally consider the following factors: (1) debtor's accuracy in stating his debts and expenses, (2) debtor's honesty in the bankruptcy process, including whether he has attempted to mislead the court and whether he has made any misrepresentations, (3) whether the Bankruptcy Code is being unfairly manipulated, (4) the type of debt sought to be discharged, (5) whether the debt would be dischargeable in a Chapter 7, and (6) debtor's motivation and sincerity in seeking Chapter 13 relief).  This Court will consider all the *Gier*, *Flygare,* and *Cranmer* factors to determine whether Debtor filed his Conversion Motion[34] and plan in good faith.

C.  Did the Debtor file his Conversion Motion in good faith?

After considering the hearing evidence and the Court's records, the Court finds that an application of the *Gier* factors shows that the Debtor acted in bad faith when filing his Conversion Motion, as follows:

---

[33]  "To determine whether a Chapter 13 *petition* was filed in good faith and whether a proposed Chapter 13 *plan* was filed in good faith courts employ a totality of the circumstances test. The factors for both good faith requirements are similar, but not identical." *In re Rodriguez*, 487 B.R. 275, 282 (Bankr. D. N.M. 2013).  The Court finds that this analysis is also appropriate where a Chapter 7 debtor seeks to convert to a Chapter 13 case.

[34]  The Court will analyze the filing of Debtor's Conversion Motion as it would the filing of a Chapter 13 petition under similar circumstances.

16

(1) The nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding.

Here, a denial of discharge action under § 727 is pending against the Debtor in connection with his Chapter 7 filing, and a trial is set for October 9, 2013. The Harvel Creditors also have filed an adversary proceeding against Debtor, alleging claims under § 727 and §§ 523(a)(2) and (a)(4). Additionally, the Debtor's student loan debt is not dischargeable.

(2) The timing of the Conversion Motion.

Debtor filed his Conversion Motion on the eve of hearings to resolve several pending motions in his Chapter 7 case, including a motion made by the Trustee to sell Debtor's Hawaii Property. The timing strongly indicates that the Conversion Motion was filed in bad faith.

(3) How the debt arose.

While Debtor's schedules have constantly changed, the Court generally has gleaned that Debtor's debts encompass not only the debt to the Harvel Creditors but also debts for property taxes, student loans, medical services, and credit card providers, some of which arose post-petition.

(4) The debtor's motive in filing the petition.

The timing of Debtor's Conversion Motion, in combination with the Venue Motion, on the eve of the Hawaii Property sale hearing, strongly indicates that Debtor's motive in filing his Conversion Motion was to stymie the Trustee's administration of his Chapter 7 estate, rather than an honest intention to repay creditors. The Court has already found that the Debtor filed his previous Chapter 7 cases to hinder and delay creditors. The attempt to now convert to Chapter 13 is a continuation of that behavior.

(5) How the debtor's actions affected creditors.

The Chapter 13 filing only served to increase the expenses of, and delay any recovery to, creditors. The Harvel Creditors assert they have spent thousands of dollars in legal expenses and countless hours dealing with Debtor's efforts to delay action in a bankruptcy case that he voluntarily filed.

(6) The debtor's treatment of creditors both before and after the petition was filed.

Before Debtor filed the Conversion Motion, he filed three bankruptcy proceedings in less than two years to stop eviction proceedings by the Harvel Creditors. After his conduct led this Court to enter its Order granting relief from stay to the Harvel Creditors to evict Debtor from his Colorado residence, Debtor then pursued other ways to game the system in order to stymie the Trustee's efforts to administer his Chapter 7 estate. As soon as the Trustee investigated Debtor's financial affairs and found that there are assets to be administered for the benefit of creditors, Debtor moved to convert his case to Chapter 13. Creditors have already waited far too long for a distribution from Debtor's bankruptcy filings.

(7) Whether the debtor has been forthcoming with the bankruptcy court and creditors.

Debtor has repeatedly failed to be forthcoming with other parties and with the Court. As previously noted in this Order and in the Court's prior order denying Debtor's Venue Motion, Debtor has refused, under oath, to clearly state where he lives, where he works, or where his income originates. Instead, he has taken the Fifth Amendment and wants creditors to take his word for everything. He has repeatedly changed the descriptions, addresses, nature, and value of his property. Debtor has been anything but forthcoming throughout his multiple bankruptcy filings.

D. Did the Debtor file his Chapter 13 Plan in good faith?

After considering the hearing evidence and the Court's records, the Court finds that an analysis of the *Flygare* factors in this case are indicative of the Debtor's bad faith in filing a Chapter 13 plan, as follows:

(1) The amount of the proposed Chapter 13 payments and the amount of the Debtor's surplus.

Debtor filed his Amended Schedule J on April 24, 2013 (docket #225) and his Chapter 13 Plan (the "Plan") on April 24, 2013 (docket #226). Debtor claimed a surplus of $305.00 per month and committed to make 36 monthly plan payments of $211.00. Thus, the Plan failed to provide that all of Debtor's projected disposable income will be applied to paying unsecured creditors as required by 11 U.S.C. § 1325(b)(1)(B).[35] Debtor then filed amended schedules and an Amended Plan on May 29, 2013. The amended schedules showed disposable income of $235 per month, even with the addition of the "sealed" employer, and the Amended Plan committed to make 36 monthly payments of $234. Given Debtor's inconsistent filings and testimony, it is difficult, if not impossible, to determine Debtor's actual income and expenses. In any event, both the Plan and the Amended Plan fail to account for significant unpaid Chapter 7 administrative expenses (in excess of $22,000), or for student loans (in excess of $100,000) that must eventually be repaid.

(2) The debtor's employment history, ability to earn and likelihood of future increases in income.

Debtor has advised the Court that he suffers from health problems which prevent him from attending morning hearings, that he is too busy with deadlines from San Diego State University to participate in hearings, that his health prevents him from traveling to Colorado, that his health requires him to spend part of the year in warmer climates, and that he has a difficult time answering questions due to health problems. If those statements are true, they are inconsistent with a claim that Debtor has the ability to earn a viable income stream, and cast doubt on the likelihood of future income. The Court is also concerned that Debtor's claimed disability will adversely affect his ability to carry out his fiduciary duty to creditors in Chapter 13. This is especially so where Debtor has taken the Fifth Amendment regarding routine questions about his employment income and has

---

[35] Debtor appears to be a below-median debtor; but Debtor has not accurately disclosed his sources and amounts of income so that the Court can make that determination.

18

sought to fund his Plan by impermissible sources, such as student loans. Without some verifiable, concrete evidence of Debtor's ability to pay, the Court cannot find that Debtor is eligible for Chapter 13 or that Debtor's Plan is feasible and in good faith.

### (3) The probable or expected duration of the plan.

As shown above, the duration and expected distribution under any proposed plan is grossly inadequate to satisfy the requirements of 11 U.S.C. § 1325. The Plan does not provide a larger distribution to creditors than they would receive under Chapter 7 as required by § 1325(a)(4). For instance, the Trustee already had a buyer in place for the sale of the Hawaii Property, which would have resulted in dividends to creditors that they will not receive under Debtor's Plan.

### (4) The accuracy of the plan's statements of the debts, expenses and percentage of repayment of the unsecured debt and whether any inaccuracies are an attempt to mislead the court.

The information contained in the Debtor's Plan, Amended Plan, and amended schedules is largely at odds with, and contradictory to, information contained in other pleadings and documents put forward by the Debtor and the Trustee. The Debtor has failed to properly disclose the amounts and sources of employment, inheritance, family gifts, and school loans which he asserts are sufficient to fund a plan. In fact, the evidence suggests such income may be nonexistent.

### (5) The extent of preferential treatment between classes of creditors.

The Debtor proposes to prefer the Harvel Creditors (who are insiders) without justification or legal basis. But, the Harvel Creditors have objected to Debtor's Plan as inadequate (the total amount of proposed payments to unsecured creditors is $3,424). The only other payments proposed to be made through Debtors' Plan are for property taxes of $3,000, Chapter 13 Trustee compensation ($710), and Debtor's alleged attorney's fees of "$1,290 or more."[36]

### (6) The extent to which secured claims are modified.

This factor is inapplicable, although the Court has little information on whether the Debtor owes secured debt.

### (7) The type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7.

As previously noted, a denial of discharge action under § 727 is pending against the Debtor in connection with his Chapter 7 filing, and a trial is set for October 9, 2013. The Harvel Creditors also have filed an adversary proceeding against Debtor, alleging claims under §§ 727, 523(a)(2), and 523(a)(4). Additionally, the Debtor's student loan debt is not dischargeable. The Trustee has incurred attorney's fees and costs that must be dealt with as an administrative expense in a Chapter 13 plan.

---

[36] See Section IV regarding Debtor's alleged attorney's fees.

(8) <u>The existence of special circumstances such as inordinate medical expenses.</u>

Here, the Debtor has not disclosed any inordinate medical expenses or special circumstances that would justify his last minute attempt at conversion.  At the time of the Trustee's Motion to Reconsider, Trustee did not have access to Debtor's medical records because they were sealed pursuant to Debtor's request.  In any event, the Court's review of the medical records shows that while Debtor does have medical expenses that have been continuously incurred over the past several years,[37] the records do not reflect a significant change in Debtor's medical expenses that would justify a last-minute conversion to Chapter 13.

(9) <u>The frequency with which the debtor has sought bankruptcy relief.</u>

The Court has already found that the Debtor has filed multiple bankruptcy cases in this district with the intent of hindering, delaying, and defrauding creditors in its October 10, 2012, order that granted relief from stay under § 362(d)(4)(B) (docket #67).  Debtor's prior bankruptcy filings are detailed in this Court's order that denied Debtor's Venue Motion (docket #295).

(10) <u>The motivation and sincerity of the debtor in seeking Chapter 13 relief.</u>

Evidence that the Debtor is seeking to convert this case to further his efforts to avoid the negative consequences of his bad faith Chapter 7 filing is overwhelming. The Debtor has failed to comply with the most basic requirements of the Bankruptcy Code.  Over the course of three bankruptcy cases, Debtor failed to attend at least four scheduled § 341 meetings.  In his most recent case, he failed to do so even after a Court order.  Debtor also failed to timely answer discovery, and, after being ordered by the Court to respond, filed incomplete and nonresponsive answers.  These failures resulted in two motions for sanctions from the Trustee, which have been held in abeyance and will be determined by this Court in due course.

(11) <u>The burden which the plan's administration would place on the Ch. 13 trustee.</u>

Should the Court not reconvert the instant case, the Chapter 13 trustee would be faced with the onerous task of reviewing previous transcripts and pleadings from the Chapter 7 case to get somewhat up to speed.  Moreover, the Court is doubtful that the Chapter 13 trustee will be able to obtain Debtor's cooperation in light of Debtor's attempts to thwart the administration of his Chapter 7 case.   If Debtor proceeds in the same manner that he has thus far, the Chapter 13 trustee will be substantially burdened.

---

[37] Debtor has listed medical providers as creditors in all five of his bankruptcy proceedings.  Additionally, in his Schedule I for case 97-25757, he noted: "possible long-term medical leave within one year."  Thus, any medical disability that precludes Debtor from a regular income is not new.  It also appears that some of his debt to medical providers was incurred post-petition (Debtor's amended Schedule F, docket #245), and therefore would not be dischargeable in the current bankruptcy case.

In addition to the *Flygare* factors, this Court must consider the *Cranmer* factors:  whether the Debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; and whether he has unfairly manipulated the Bankruptcy Code.  *Cranmer,* 697 F.3d at 1319.  The Court finds these factors also demonstrate the Debtor's bad faith.

First, like the debtor in *Marrama*, Debtor has provided false and inconsistent statements regarding his assets.  On his original filing, Debtor did not disclose the ownership of any interest in the estate of a decedent, but after the Trustee investigated, he amended schedules to include his interest in the Velma Harvel Estate.  He also did not disclose the ownership of any contingent or unliquidated claims, but later disclosed claims against the Harvel Creditors.  Apparently, the Debtor's disclosures come mostly in response to the actions taken by the Trustee and creditors to more thoroughly investigate his statements and averments.

Second, the Court concludes that Debtor has made fraudulent misrepresentations because the value, location, type of property, and exemptions for his Arizona and Hawaii Property have changed every time Debtor has amended his schedules; in fact, the address of his Arizona Property has been somewhat of a mystery.  Debtors may amend bankruptcy schedules as a matter of course, but an amendment may be denied if there is bad faith by the debtor or prejudice to creditors.  *In re Ford*, 492 F.3d 1148, 1155 (10th Cir.2007).  A debtor who has intentionally omitted an asset will be denied the opportunity to amend the exemption claim to include the newly discovered asset.  *In re Dipzinski*, 234 B.R. 746, 748 (Bankr. E.D. Ark. 1999) (citing *In re Yonikus*, 996 F.2d 866, 873 (7th Cir.1993)).

Third, Debtor has engaged in a pattern of behavior which demonstrates he has unfairly sought to manipulate the Bankruptcy process and Code.  On the eve of hearings to resolve several pending motions in his Chapter 7 case, including a motion made by the Trustee to sell Debtor's Hawaii Property, Debtor filed the Conversion Motion (and the Venue Motion). The timing of the Conversion Motion strongly supports the Trustee's argument that Debtor sought to convert not in an honest effort to repay creditors, but instead to "defer or avoid the claims of legitimate creditors." *In re Vick*, 327 B.R. 477, 486 (Bankr. M.D. Fla. 2005).

Additionally, Debtor has shown bad faith in his conduct thus far as a Chapter 13 debtor.  He has disclosed a large amount of student loan debt, but failed to amend his schedules with the names of the applicable creditors.  In his most recent Schedule F, filed on May 13, 2013, Debtor added "old and new creditors" including post-petition creditors in Arizona, California,  and Texas.  He has refused to answer basic questions about his employment, a key component of a Chapter 13 plan process.  His Plan does not account for any administrative expense payment to the Trustee's counsel (as Debtor alleges this payment is "disputed"), or for the eventual payment of his unsecured, but non-dischargeable student loans.  Finally, Debtor again wants to "phone in" his Chapter 13 § 341 meeting of creditors (docket #283).

"Debtors in bankruptcy . . . have few responsibilities imposed on them by the Bankruptcy Code as a condition to the grant of the significant benefit to be enjoyed by the entry of an order of discharge.  One of those responsibilities, and, indeed, one of the most important, is that they 'shall appear and submit to examination under oath at the meeting of creditors under section 341(a).'" *In re Ladner*, 156 B.R. 664, 665 (Bankr. D. Colo. 1993)(continuing, but not excusing, debtor's

appearance at § 341 meeting due to overseas military assignment).  Debtor has continually refused to accept this most basic responsibility, either in Chapter 7 or Chapter 13.

Debtor has continued to blame medical problems for his failure to comply with the Bankruptcy Code and to be forthcoming with the Court and with other parties.  As previously stated, the Court has reviewed the medical records provided by Debtor.  While medical problems might be a contributing factor to some of Debtor's delay in this case, and also somewhat a factor in his failure to accurately remember events, they do not account for his failure to comply with the most basic requirements of the Bankruptcy Code or to follow court orders during his multiple filings with this Court.  Further, if medical problems affect Debtor's ability to be a Chapter 7 debtor, they will surely be an impediment to his ability to fulfill his fiduciary duties under Chapter 13.

In sum, most, if not all, of the applicable *Gier, Flygare,* and *Cranmer* factors weigh against Debtor and in favor of returning this case to one under Chapter 7.  Apparently Debtor expects to receive all of the benefits of a bankruptcy filing (and more) without accepting what burdens the law imposes in order to receive a discharge.  The Debtor's attempted conversion to a case under Chapter 13 is a transparent attempt to frustrate the Trustee's efforts to administer Debtor's Chapter 7 estate and to further hinder or delay the creditors' ability to obtain some recovery on their claims.  The Court concludes that the Debtor has exhibited the kind of atypical conduct that makes his case the type of extraordinary case which must be converted from Chapter 13 back to Chapter 7, as *Marrama* directs.

The Court further finds, under Rule 59(e) and 60(b)(6) that the Motions to Reconsider the Conversion Order should be granted in the interests of justice.  It would be manifestly unjust under Rule 59(e) to allow the Conversion Order to stand, in light of the multiple instances of bad faith exhibited by the Debtor throughout his multiple proceedings before this Court.  *See Nordin* at *5.  Further, this case presents the "extraordinary" and "exceptional circumstances" where Rule 60(b) relief is applicable.  *See In re McDonald* at *6 (relief under Rule 60(b) is extraordinary and should be granted in exceptional circumstances).  As the Tenth Circuit noted in *Fleming*, for a Court to grant 60(b)(6) relief, "the case must be one of genuine substance.  Thus, it would not be controlled by a subjective view of equity and good conscience.  However, it might well be controlled by an objective view that equity and good conscience demanded."  *Fleming*, 547 F.2d at 913.  Here, an objective view of equity and good conscience, in light of the Trustee's evidence of the Debtor's bad faith, demands that this case be re-converted to one under Chapter 7.

For all the foregoing reasons, the Court finds Debtor filed his Conversion Motion in bad faith.  The Court will grant the Motions to Reconsider and re-convert Debtor's case to one under Chapter 7.

IV.     Motion for Legal Expenses.

In the Conversion Motion, Debtor avers that he hired an attorney on March 22, 2013, to negotiate a settlement with the other parties, and the attorney did some work on the case until he stopped returning Debtor's calls and emails on April 3.  He asserts that the Trustee and his attorney have tried to "slander and intimidate" him, and requests that the Trustee pay his attorney fees of $5,000.  The Trustee denies Debtor's assertions and states affirmatively that neither the Trustee or his counsel has ever improperly threatened, defamed, slandered, or attempted to intimidate the

Debtor or any members of his family.  The Court has observed no evidence of such conduct by the Trustee or his counsel, either in pleadings or at hearings throughout this case.

By all appearances, Debtor has represented himself pro se during the course of his bankruptcy proceedings.  No counsel has entered an appearance on his behalf in the bankruptcy case.  Debtor was represented by counsel, pro bono, as part of the Faculty of Federal Advocates program, for a short time, in adversary proceeding #12-01777, commenced by the UST and Trustee for denial of discharge, but that counsel has since withdrawn.  Debtor also had a counsel attend an incomplete § 341 meeting on November 7, 2012, but apparently that counsel ceased representing the Debtor within days of that meeting without ever entering an appearance.  Debtor stated in his amended statement of financial affairs filed on December 13, 2012, that he paid attorney Chris Lane between $1500 and $2000 during the summer of 2012, but has not provided any evidence of payments.  The Court finds Debtor has not carried his burden on this issue, and will not grant the relief Debtor has requested.

Accordingly, IT IS THEREFORE ORDERED that the Motions to Reconsider are GRANTED, and Debtor's Motion for Legal Expenses is DENIED.  The Court's Order dated April 8, 2013, converting this case from one under Chapter 7 to one under Chapter 13 is VACATED.  A separate order will enter RE-CONVERTING the case from one under Chapter 13 to one under Chapter 7.

Dated this   8th   day of August, 2013.

BY THE COURT:

_____
Howard R. Tallman, Chief Judge
United States Bankruptcy Court

23